## ANA MARIA HERNANDEZ ET AL.

*v.*

## J. OCHOA Y HERMANO.

---

San Juan, Equity, No. 586.

1. Under the mortgage law of Porto Rico, a duly recorded certificate of dominio title or ownership is the legal title to the property, and, in the absence of any other recorded title in said same registry, protects innocent third parties. Pettingill v. Rios, 4 Porto Rico Fed. Rep. 549, followed.

2. After the date of the signing of the treaty of Paris (December 10, 1898), and consequently after hostilities had ceased, the commanding general of the American forces in Porto Rico was without power to issue a general order, reducing the period of limitation that must elapse between the obtaining of "posesorio" and "dominio" certificates of possession and ownership of land from twenty to six years, without affording parties affected by it a reasonable time to assert their rights in court before their property rights were entirely cut off.

3. Such a general order reducing the period of limitation to six years, being by its terms retroactive, is void as to a case where more than

Hernandez v. Ochoa y Hermano.

six years had already elapsed of the former limitation, and a "dominio" title or certificate of ownership obtained thereunder does not protect otherwise innocent third parties. The court that issued such a certificate was wholly without jurisdiction. The effect of the military order in such a case was to take the property without due process of law.

4. *Quære*, and not decided: Whether such a military order, even though retroactive by its terms, may not have the force of law as to cases where a reasonable portion of the six years yet remains?

5. Every department and official of the government of the United States, wherever acting, is at all times subject to those fundamental limitations in favor of personal rights which are formulated in the Constitution and its Amendments. The only exception to this would probably be the acts of a military commander, arising out of sheer military necessity in time of actual hostilities. Therefore, after hostilities have ceased, the military commander, when acting regarding civil matters and general personal and property rights, has no power to deprive any person of his property save by due process of law of some sort.

Opinion filed April 2, 1910.

Messrs. *Joseph Anderson, Jr.,* and *Hord & Scoville,* solicitors for complainants.

Mr. *T. D. Mott, Jr.,* solicitor for respondent.

RODEY, Judge, delivered the following opinion:

A suit at law was filed on the cause of action, out of which the controversy involved in this litigation arises, under date of March 23, 1908. It was against the respondent firm of J. Ochoa y Hermano alone, the firm being made up of some five persons. After preliminary pleading, an issue was raised on the merits, and the cause went to trial, under stipulation before

Hernandez v. Ochoa y Hermano.

the court alone, without the intervention of a jury, on May 1, 1908, but after proceeding for some time it became manifest that the suit was on the wrong side of the court, and hence a nonsuit was requested, granted, and taken with a view to filing a bill in equity to enforce plaintiffs' alleged rights.

Thereafter, under date of October 12, 1908, this bill in equity was filed against the same respondents forming the firm of J. Ochoa y Hermano, as aforesaid. On November 4th thereafter, the then respondents demurred to the bill, and two days later, on November 6th, complainants filed a motion to strike the demurrer from the files. Three days after this, on November 9th, this motion was overruled, and two days later, on November 11th, by leave of court, an amended bill was filed, which added the respondent Camilo Taboas, as an additional party. However, no attention appears to have been paid to the adding of this additional party, and briefs on the demurrer of November 4th aforesaid were presented on both sides during the month. On December 26, 1908, the court, in an opinion of some length (4 Porto Rico Fed. Rep. 400–409), ordered the demurrer overruled.

On December 14, 1908, respondent Camilo Taboas appeared by counsel, but filed no pleading of any sort. It is asserted in the pleadings, and is probably true, that his counsel thereafter withdrew his appearance, but it also appears that on January 14, 1909, said same respondent Taboas again appeared by the same counsel. Thereafter, on the 10th day of May, 1909, counsel for the complainants filed a paper alleging that said Taboas had appeared, but had withdrawn his appearance, and they presented an order which the court did not sign, endeavoring to take the bill as confessed against said respondent, but it was refused

because his counsel had withdrawn without notifying him; and therefore the clerk was required to immediately notify said respondent of the situation, and stated that if within ten days he did not appear, counsel for the complainants might then apply for the decree *pro confesso.*

Thereafter, on February 14, 1910, counsel for complainants appear to have abandoned their desire for the decree *pro confesso,* but instead asked for, and were granted, leave to, and did, dismiss the bill as to said respondent Camilo Taboas.   Then the cause, without any other change or amendment to the bill, remained at issue on the answer filed by the respondent firm of J. Ochoa y Hermano.

We cannot state the cause of action and the prayer of the bill clearer than we did in the opinion on the demurrer in 4 Porto Rico Fed. Rep. 401–402, supra, which is as follows:

This is a bill in equity praying that complainants be decreed to be the owners of 106 cuerdas of land, situated in the barrio of Nuevo, in the jurisdiction of Naranjito, Porto Rico.   In substance, they allege that they inherited this land from their paternal grandfather, through their father, both of whom owned, possessed, and occupied it successively for many years.   That while complainants were yet infants, and they, with their widowed mother, were in possession of, and living upon, the premises, their maternal grandfather, who was also living thereon with them, and administering the said estate for them, fraudulently entered into a conspiracy with one of the respondents and secured a "posesorio," and later, while they were still minors, a "dominio," ownership or title in his own name to said land, and procured the inscription or recording of each of the same in the proper registry of property, and thereafter trans-

Hernandez v. Ochoa y Hermano.

ferred the land to such respondent, who, in turn, thereafter transferred it to the remaining respondents, but that the latter, and in fact, all of the respondents, at all times, had full and complete knowledge of the rights of these present complainants, and knowingly and fraudulently entered into such conspiracy to so deprive them of their property, and did, in pursuance thereof, thus secure the legal title thereto, and oust and eject complainants from the same, and have ever since deprived them of the possession, use, and enjoyment thereof.

Complainants also allege that they are brother and sister, and, practically speaking, have recently come of age, and therefore bring their bill to assert their rights in the premises.

In substance, they pray that the property be held to be subject to their interests, and that the respondents be obliged to discover all the applications, petitions, alleged titles, descriptions, rights, registrations, transfers, etc., by which they, the respondents, pretend to hold or have title to the property in question, and that each and all of the same be canceled of record and held for naught, and the complainants be fully vested with the complete legal title thereto; and that the same, by order of court, be inscribed in their names in the proper registry of property; and further, that respondents be obliged to account for the mesne profits of the said land since the fraudulent and wrongful taking of the same, as alleged, and that they have general relief in the premises.

Thereafter, on February 23d and 24th, 1910, this equity cause came on for trial on the merits before the court alone, without the intervention of an examiner or master, when all the evidence was heard orally, exhibits introduced, and the case argued orally and submitted. Since that time counsel for the respective par-

ties have filed elaborate arguments and briefs, all of which we have examined with care. We have also gone over the exhibits, which are numerous, and have read a transcript of all the evidence that was taken in the suit at law before it was dismissed, and in addition have verified the statements of counsel in their briefs as to the evidence in this chancery suit by our own recollection of it, and by causing the stenographer to read large portions of his notes thereof to us. From the knowledge thus gained of the facts surrounding the controversy, we can state the proofs to have established the following facts:

That complainants did in fact inherit the land in controversy through their father, from their paternal grandfather, who died as long ago as 1872, and who had owned and possessed it for many years, and that their father was in possession of it for several years before his death under a private division of the estate of the grandfather that had been made among his family. That on the death of complainant's father, their maternal grandfather, Raimundo Morales, took charge of the complainants and their mother, the former then being small children. That their mother, in a year or two, contracted a second marriage, and that then complainants continued to live on the land in question with their mother and stepfather. That shortly thereafter the stepfather died, and somewhat later their mother, when their maternal grandfather, the said Raimundo Morales, again took charge of complainants, who were still small children, and brought them to live at his own residence, some 10 kilometers away, and in addition took charge of this land for them, at times bringing one or the other of them for a short time to the land in question during the coffee picking seasons. That in the year 1890 this maternal grandfather of the infants, with full knowl-

Hernandez v. Ochoa y Hermano.

edge of their rights, but in total disregard thereof, fraudulently appeared before an insular court and secured in his own name an order for a posesorio title to the land in controversy, which he caused to be duly inserted in the proper registry of property. That he thereafter sold it conditionally to a mercantile firm by the name of Perez, but afterwards bought it back, and then sold it to the former respondent in this case, Camilo Taboas, but also under a conditional sale, which he failed to redeem within the time specified, but nevertheless Taboas gave him additional time in which to do so. That finally, in about the year 1899, their said maternal grandfather again fraudulently, and in contravention of their rights, appeared in the municipal court of the district where the land was situated, and by means of what were probably false witnesses, secured the conversion of his posesorio into a dominio title or certificate of ownership, also in his own name, which he in like manner caused to be duly inscribed in the registry, thus making his sale to Taboas apparently prima facie good. It was further proved that about this time Taboas, who was a merchnt of considerable calibre, was indebted to the respondent firm of J. Ochoa y Hermano in the sum of about 25,000 pesos, provincial money, and that, wanting to reduce it, he went to said firm and told them of having this conditional deed for the land in controversy, which was accompanied by a note to him to secure the amount due, which was something between $1,500 and $2,000, and he tried to induce said firm to accept the conditional deed, mortgage or whatever it could be construed to be, as a credit against his debt, and represented to them that the same was good security. It is not quite clear why Taboas wanted this done, save perhaps to relieve some of his own other property, because he had a large mortgage out-

Hernandez v. Ochoa y Hermano.

standing to said firm to secure the large debt he owed them. During the trial this maternal grandfather, Raimundo Morales, came on the stand and confessed all of these doings and wrongs towards these children, and in an effort at an excuse for his action, stated that he had used the money he borrowed at different times largely for the benefit of his daughter, the mother of these children, and further, that when he heard that Taboas was about to transfer the debt to the respondent J. Ochoa y Hermano, he demurred and objected, for fear they would be harsh with him, and might foreclose on him, and that then he told Taboas that the property in truth and in fact belonged to his grandchildren, and that he wanted to redeem it so as to turn it over to them. This witness also stated that he told some member of the respondent firm, he does not remember which, before he finally closed the trade with them, that the property did in fact belong to his grandchildren, and that he had wrongfully obtained the posesorio and dominio titles thereto. At least, that is the effect of his whole testimony.

Taboas also came on the stand as a witness in the case, and stated that he did not know at the time he first received the property from Morales that it really belonged to the children, but that about the time he began negotiations with the respondent J. Ochoa y Hermano, he told one of their number, Severo Ochoa, who at the time of the trial was absent in Spain, that it really did belong to the children, and that for such reason the old man Morales would surely redeem it, etc., and that therefore it was first-class security. Under cross-examination he also stated that this man Severo Ochoa asked him if there was anything on the record to show title outstanding in anybody except himself, the witness, and that he said there was **not.**

Hernandez v. Ochoa y Hermano.

It transpired that the respondent firm of J. Ochoa y Hermano agreed to the transfer of the debt and the security, but, to avoid any question, insisted that Taboas deed the land back to Morales, and that the latter then give them a mortgage direct to secure Morales' note, which had been endorsed to them by Taboas. This was done, but the mortgage was not taken for nearly two years,—until 1901,—and then, in 1903, Ochoa y Hermano insisting on it, he transferred to them the entire property in payment of the debt, which then amounted to something over $2,100. The respondent firm then went into possession of the property through an agent, none of them, so far as the record shows, ever having seen it, and they have been in possession of it ever since, but the evidence shows that they obtained little or nothing by leasing it, getting only some $50 a year during the six or seven years they have had it, the tenants only sometimes paying the taxes, and that it is land devoted only to pasture.

The oral evidence as well as the large number of exhibits introduced showed that this property and several hundred cuerdas additional had been, as stated, in possession of the paternal grandfather of complainants for many years, he dying as an old man in possession of it in about the year 1872, and that complainants' father thereafter remained in possession of this particular tract, owning and cultivating it for some six or seven years before his death. And that the mother of complainants, and the stepfather, remained thereafter in possession of it for several years, up to the time of the death of the mother, when the maternal grandfather, Morales, went into possession of it as aforesaid, and got the posesorio title thereto. There are three or four deeds to the paternal grandfather of complainants in evidence for about 30 cuerdas of land each, which it was

Hernandez v. Ochoa y Hermano.

claimed referred to this particular tract of land, but the identification of it is not very certain. However, the possession of this particular piece in controversy was unquestionably proved as here stated.

Respondents J. Ochoa y Hermano, both in their answer and by their proofs, claim that they are innocent purchasers for full value of the tract of land in question, and that they never had, up to within two or three days of the filing of the original suit at law, any knowledge whatsoever of any rights of these infants in or to the same; that they took the same in the best of faith, after causing a thorough investigation of the title, which appeared recorded in dominio ownership in the name of the said Taboas and afterwards in the name of the said maternal grandfather, Morales, and therefore they contend that they should not be deprived of the property.

We are therefore confronted with a peculiar situation. Is it the intent of the mortgage law of Porto Rico that a dominio title duly recorded, when no other record regarding that property appears in the registry, shall protect any purchaser thereof with or without notice of the rights of others thereto? In other words, must innocent infants, who are defrauded by a relative, be left remediless unless they can show knowledge, previous to his purchase, in any third party, of their rights, and who purchases the property from someone who secured a fraudulent dominio ownership thereto in the courts?

We have therefore decided, and we think we were right, that a person who buys such property with knowledge of another's rights is certainly not protected. See our decision in Pettingill v. Rios, 4 Porto Rico Fed. Rep. 549. We do not think this holding in any manner affects our holding in the second appeal in

Hernandez v. Ochoa y Hermano.

Romeu v. Todd, 4 Porto Rico Fed. Rep. 445, now *sub judice* in the Supreme Court of the United States, because that case turned upon entirely different facts with reference to the chancery rule of *lis pendens*.

As to the question of actual knowledge on the part of J. Ochoa y Hermano previous to their acquisition of the note or debt of Morales, which Taboas transferred to them, and of the making of the deed to them for the property concerning which this litigation is pending, Morales himself testified in the suit at law, p. 46, transcript, that he did not know if that firm had any knowledge of the interest of the children in the land when he dealt with them, and that he did not remember that he told them that. Yet in this equity suit he came into court and squarely testified that he did so inform one of the members of the firm, but could not remember who. After having seen this old man testify, and after having read his testimony as far as he gave it in the suit at law, and having had the stenographer read most of his testimony in this suit to us, we unhesitatingly say that he is unworthy of belief, and therefore we leave his evidence in that regard out of the equation. We will confess, though, that we were astonished at the evidence of Mr. Toboas, when he squarely stated that he told Severo Ochoa of the respondent firm about this land belonging to the children, and, as the witness for the said firm, who was present, could give us no reason why Taboas so testified if it was not true, we were at a loss to account for it in any way unless it was true. We, however, have gone over the record, and have ascertained the facts set out in the beginning of the statement aforesaid of this case,—that this man Taboas was made a respondent in the equity suit, although he was not a defendant in the suit at law,

nor even in the equity suit as first filed, but that between the time of the filing of the amended bill by which he was made a party and the date of the trial the cause was dismissed as to him. Therefore we can well see that his testimony may have been colored by the fact that he was thus relieved of possible liability, with which he was threatened in the amended bill on November 11, 1908.

The only witness for the respondent firm was one Angel Gonzalez, who was the attorney, in fact, for the firm for several years before he became a member thereof in 1905. He was the person who did all the transferring and attended to all the accounts between Taboas and J. Ochoa y Hermano. He seemed to remember all the facts distinctly, and he positively swore that he certainly never heard of the interest of these children in this land, and that he is morally certain that he is the one who did all the business, and while he could not say but what Taboas may have told the absent member of the firm about it, yet he certainly did not think so, because the firm were so careful in all their transactions. That in this instance they were so careful as that, because the sale to Taboas was known to be a conditional one, they required it to be retransferred to Morales before they would even take a mortgage on it to secure their debt.

After mature consideration we therefore hold that the complainants have failed in their proofs to show actual specific knowledge on the part of J. Ochoa y Hermano previous to this purchase as to any interest on complainants' part in and to the land in controversy.

We are also constrained to hold that the respondent firm of J. Ochoa y Hermano received this land without any actual and

Hernandez v. Ochoa y Hermano.

specific knowledge of any interest of complainants therein, and that in that sense they are innocent purchasers for value, and the title they secured was the apparent legal title of record. But there is another view of the case that we will refer to later. If it can be said in answer to this holding that it is repugnant to the conscience of a chancellor to say that a grandfather can, in the manner developed by the facts here, steal his grandchildren's property,—for that is what it amounts to,—and that they have no remedy after he records his fraudulent title, and it gets into the hands of an innocent third party for value, our answer, of course, would ordinarily be that the remedy is with the lawmakers and not with the court. We do have to say though, under what we think is the binding force of the decision of the Supreme Court of the United States in Romeu v. Todd, 206 U. S. 367, 51 L. ed. 1096, 27 Sup. Ct. Rep. 724, that a dominio title, which bears no evidence on its face, as recorded, showing its invalidity under article 37 of the mortgage law, and with no other title on record in that same new mortgage law registry, about the property referred to, is the legal title, which protects innocent third parties. See also our decision in this same case, 4 Porto Rico Fed. Rep. 407, supra; also Compania General de Tabacos v. Topiño, 4 Philippine, 33; Merchant v. Lafuente, 5 Philippine, 638. It is simply the fault of the law if persons situated like these complainants, now that they are of age and can act for themselves, ordinarily cannot recover the property. We do not think though that such fact would deprive them of their action against every person who took part in perpetrating the fraud against them, such as the witnesses their grandfather produced before the court when he obtained the posesorio title, and the witnesses he produced before

the court when he obtained the dominio certificate of ownership, and neither are we deciding as to what their remedy might be against this man Taboas, who knew of their rights and yet aided their grandfather to put their property out of his hands and his and their reach.

Before referring to the other view of the case, as referred to above, we might say that the mortgage law of Spain, which existed in the peninsula for some thirty years previously, was modified and extended, together with its regulations, to Porto Rico and the Philippines in 1893. The law itself is an elaborate system of registration of property, somewhat resembling what is known in several of the states of the Union as the Torrens law, save that it unfortunately does not provide a fund for the reimbursement of those who may be injured by its strict enforcement, and save that it was evidently passed in the interest of those lending money on mortgages rather than with any view of simplifying and protecting land titles as such. Under this law it was provided that all conveyances or titles existing in the previous record books should be transferred within a limited time (one year) to the books wherein the registry under this new system was kept, in order to be valid against third parties. It also provided that persons having no written title of any kind, but who were in possession of land might, before the proper tribunal, on presenting proper proofs and fulfilling certain requirements, secure a certificate of possession, or what has become known among the members of the bar here as a posesorio title, which we have held (see Pares v. Reynes, 2 Porto Rico Fed. Rep. 403) to be nothing more than notice to the world that the person in whose favor it is issued is holding adverse possession of the property described. It also provided that, after the

holder of such posesorio title had thus been in possession of the property without successful attack against him for twenty years, he might apply to the proper court and, after again fulfilling certain more elaborate requirements as to notice to the public and all adjoining landowners, etc., convert this possession into a certificate of dominio title or ownership, which appears to be the highest sort of title held to property in Porto Rico, and which we have held, as aforesaid, to be prima facie at least, the legal title to the land, and which, in the absence of any other or better recorded title, is supposed to be good against all the world.

Now it transpires that in this particular case the conversion of the posesorio title, which was secured in 1890, to a dominio title, took place only a little over eight years thereafter, in 1899. One of the exhibits, which is the dominio certificate itself, and which sets forth all of the proceedings that led up to it, shows that the posesorio thus ripened into a dominio title, or was by the court thus converted under and by virtue of a general military order, issued from the office of the secretary of justice, under authority of Major General Guy V. Henry, in command of the United States troops in Porto Rico during the military *régime* in 1899. The date of the order, which ordinarily should have the force of law, is April 4th of that year. The order comprises some six sections, and in its scope amends, changes, or repeals every conflicting article of the old Civil Code, which was then still in force, and of the mortgage law and its regulations referring to the subject, and, among other things, shortens the period of limitation that must elapse between the date of a posesorio certificate, or title, and the time of its conversion to a dominio title or certificate of ownership, from twenty to six years. Its seventh section reads as follows: "This order shall have retroactive effect."

Hernandez v. Ochoa y Hermano.

There is nothing in and about this military order which thus shortens the period of limitation as to existing rights, that gives anybody opportunity to assert their existing rights before it shall go into effect. It can be seen that in this particular case almost nine years of the twenty-year period of limitation had already elapsed on the date of the issuance of this order, which, by its own terms, was to have immediate retroactive and prospective effect.

We find on examining the law that it has been held, not only by the highest courts of most of the states of the Union but by the Federal courts as well, including the Supreme Court of the United States, that a statute cannot bar existing rights of claimants, without affording them a reasonable time of sufficient duration to resort to the courts for the enforcement of the rights upon which the limitation is intended to operate. This, it seems, is the universal rule under the American flag, and is so because to do otherwise would be taking the property of citizens without due process of law. It would be tiresome for us to even partially review the number of cases in which this doctrine has been held. In the case of Price v. Hopkin, 13 Mich. 318, Judge Cooley stated the proposition in this way: "It is of the essence of a law of limitation that it shall afford a reasonable time within which suit may be brought; . . . and a statute that fails to do this cannot possibly be sustained as a law of limitations, but would be a palpable violation of the constitutional provision that no person shall be deprived of property without due process of law."

In the case of Lamb v. Powder River Live Stock Co. 67 L.R.A. 563, 65 C. C. A. 570, 132 Fed. 434, the doctrine is laid down that whenever a new law or statute shortens a period of

Hernandez v. Ochoa y Hermano.

limitation, the question arises whether it is reasonable. Many cases are cited in support of the proposition, and the court proceeds to say: "It is sufficient to say that all of them recognize the true rule to be that a limitation is unreasonable which does not, before the bar takes effect, afford full opportunity for resort to the courts for the enforcement of the rights upon which the limitation is intended to operate, and that this opportunity must be afforded, in respect of existing rights of action, after they come within the present or prospective operation of the statute, and in respect of prospective rights after they accrue." See 25 Cyc. Law & Proc. p. 986, and cases cited. Also Terry v. Tubman, 92 U. S. 156, 23 L. ed. 537; Terry v. Anderson, 95 U. S. 632, 24 L. ed. 366; Vance v. Vance, 108 U. S. 514, 27 L. ed 808, 2 Sup. Ct. Rep. 854; McGahey v. Virginia, 135 U. S. 664, 34 L. ed. 305, 10 Sup. Ct. Rep. 972; Saranac Land & Timber Co. v. Comptroller (Saranac Land & Timber Co. v. Roberts), 177 U. S. 318, 44 L. ed. 786, 20 Sup. Ct. Rep. 642; Wilson v. Isemimger, 185 U. S. 63, 46 L. ed. 807, 22 Sup. Ct. Rep. 573; Davis v. Mills, 194 U. S. 451, 48 L. ed. 1067, 24 Sup. Ct. Rep. 692.

Therefore the question arises whether the general commanding the United States forces in Porto Rico during the time of the military *régime* in 1899, even though acting under the implied authority of the President of the United States, as Commander in Chief of the Army, had power, after the signing of the treaty of peace between the United States and Spain, which took place on December 10, 1898, previously, when acting concerning civil matters that were not a necessary war measure, to issue an order that would deprive any person of property without due process of law? Surely no commanding general of

our forces at such a time, in such a case, and referring to such
a matter, has power to do anything that Congress itself could
not do! To hold that the military commander has no such power
in no manner, as we see it, detracts from the general plenary
powers of the President as Commander in Chief of the Army
and Navy regarding territory under our military control. See
our opinion in Santiago v. Nogueras, 2 Porto Rico Fed. Rep.
468, as affirmed in 214 U. S. 260, 53 L. ed. 989, 29 Sup. Ct.
Rep. 608. We have several times cited in our decisions of
causes arising in this island the statement of the Supreme Court
of the United States in the Mormon Church cases, Church of
Jesus Christ of L. D. S. v. United States, 136 U. S. 44, 34
L. ed. 490, 10 Sup. Ct. Rep. 792, and we think it has particular
application as to the matter we are discussing, that "doubtless
Congress, in legislating for the territories, would be subject to
those fundamental limitations in favor of personal rights which
are formulated in the Constitution and its amendments; but
these limitations would exist rather by inference and the general
spirit of the Constitution from which Congress derives all its
powers, than by any express and direct application of its pro-
visions."

It can be seen from what we have already stated that this
military judicial order absolutely cut off all right from these
complainants, who were then infants, to assert their title to this
property, because it reduced the term of limitation from twenty
to six years, all of which had elapsed some three years before.
If the military commander was without power to do this, then
the question arises, did the obtaining of a dominio title by
Morales in 1899 give him any right other than he had before,
and if the military order is void, did not these infant children,

Hernandez v. Ochoa y Hermano.

under the mortgage law, have the remainder of the twenty years, or eleven additional years, up to 1910, to attack the dominio title in question, which they did by filing the bill in this case in 1908 as aforesaid? Section 36 of the mortgage law specifically provides that "suits for rescission or determination of title shall not be instituted against third persons who have recorded the instruments of their respective interests in conformity with the provisions of this law." And § 37 provides that "exceptions to this rule are when the suit is for rescission or determination of title, which is due to causes plainly expressed in the registry."

Now if this military order was absolutely void, and all the proceedings as to how the dominio title was obtained were recorded, and showed that this void order was the basis for assuming that the title was good, which the respondent firm of J. Ochoa y Hermano say they looked to, did they not, even though, as we have already held, they had no specific notice of complainants' rights, have actual ocular and constructive notice that the title they were buying failed for want of any law to support it?

We do not think it will do to say in answer to this that a dominio title is presumably the solemn judgment of a court and, when not appealed from, cannot be attacked collaterally, because these then infant complainants were not parties to the proceeding, and had no notice of it, save by the meagre advertisement in the official gazette, which the law required to bring in all unknown claimants. Moreover, if the judgment of the court is based on a statute or military order that was absolutely void, then the court was without jurisdiction to entertain the matter at all, and its judgment is a nullity, and can be treated as such

V. Porto Rico—31.

collaterally as well as directly.   23 Cyc. Law & Proc. p. 681 D,
and cases cited.

It will, of course, be contended that those who failed to trans-
fer their written evidence of title from the old anotadurias to the
new registries at the time of the putting in force of this mort-
gage law, or within the time limit of one year thereafter, as
provided in article 397 of the law, should have no standing in
court, but after a thorough search in the mortgage law we fail
to find that such omission would prevent anybody having a
better title, even that of possession by inheritance, from attack-
ing a person seeking a dominio certificate in the courts of the
island.   We gather from article 389 of the mortgage law that
the omission to transfer records of title from the old anotadurias
to the new registries was penalized only by a provision prevent-
ing courts from receiving the untransferred records in evidence
against third persons who relied on the new registries.   But it
appears to us that an illegal or void registry would be no regis-
try.   Therefore, is not the position of these complainants as to
this land the same as if no so-called dominio title had ever been
obtained or recorded, and this respondent firm had purchased
this land from their grandfather on his posesorio title only?

It is currently reported on the island here that General Henry
was not fully informed, at the time he issued this judicial order,
as to the necessity for issuing it, and that, as soon as the people
ascertained it was claimed such an order was in force, an uproar
arose regarding it, and so, on the adoption of the Revised Civil
Code in 1902, care was taken that §§ 1840 and 1858 thereof
were so worded as to, at least in most instances, render this ob-
jectionable six-year period of limitation innocuous, and restore
the law as it had previously existed in the Spanish Code.   That

the Code in fact accomplished this was apparently held by the supreme court of the island in Antuñano v. Registrador de la Propiedad, 1 Porto Rico, 407. But it appears that this did not, and could not help a case such as the one at bar, if the military order was valid, because the time had, as stated, long since expired at the date of the issuance of the order. It was suggested during the argument that § 8 of the organic act of Porto Rico, commonly known as the Foraker law (31 Stat. at L. 79, chap. 191), ratified the military order in question; but surely that cannot be, because not even Congress could ratify a law that it could not itself pass in the first instance. We are aware that this last statement, when referring to the power of Congress as to a territory or dependency, will give birth to a large question mark in the mental register of lawyers that see it, who are familiar with the rulings of the Supreme Court of the United States regarding the power of Congress over such jurisdictions. Especially will this be so in the light of the opening section of the organic act of the Philippine Islands (32 Stat. at L. 691, chap. 1369). By that section all the previous acts of the President of the United States regarding the said islands and their government are ratified; but we submit that there is nothing in that section that attempts to ratify, or that intimates that anything was ever done in the Philippine Islands prohibited to all United States officers everywhere, such as, save in time of war and out of military necessity, taking anybody's property without due process of law.

It was also suggested in argument that, as held in Perez v. Fernandez, 202 U. S. 80, 50 L. ed. 942, 26 Sup. Ct. Rep. 561, and in Romeu v. Todd, 206 U. S. 358, 51 L. ed. 1093, 27 Sup. Ct. Rep. 724, the intent of Congress regarding Porto Rico

Hernandez v. Ochoa y Hermano.

was and is, in so far as the same may be consistent with the Constitution and laws of the United States, to leave to the people the laws that they were accustomed to, but we submit this is not such a law. The inhabitants of Porto Rico were accustomed to a twenty-year limitation in this regard, and to change it during the military government was, to say the least, an extraordinary proceeding. It was also forcibly urged that the whole intent of the mortgage law of Porto Rico is to protect innocent purchasers of the duly recorded dominio title, and that this respondent firm was certainly in that position. All this may be admitted, but on the other side it was urged, as we think, with equal force, that the object of all property laws should be to protect everybody in their property rights; that it ought to be fundamental at all times that no person's property should be taken without due process of law, and that these infants certainly had their property taken from them without being given, as the law says they should have been, a reasonable time in which to assert their rights. In this regard it was also urged, and probably with reason, that, because under the procedure necessary to obtain a dominio title under this mortgage law of Porto Rico no proper attention is paid to the "put upon inquiry" doctrine that applies to intending purchasers under the common law, as to who is in possession of the property, no doubts should be resolved in favor of such procedure. Under this order, these infants then only about ten or eleven years old, were given no reasonable time at all in which to assert their rights. As to them the situation was and is almost the same as if this military order had specifically ordained that their property should be taken from them and given to their grandfather without consideration, with the right in him to dispose of it as he chose.

Hernandez v. Ochoa y Hermano.

As stated, the order was issued April 4, 1899, and, as to these infants, the dominio could have been applied for the next day. It was, in fact, after going through the shortened procedure, finally obtained only three months and fourteen days thereafter, on July 17th of that year, and only fifteen days' notice was given in the official gazette under the terms of this military order. But even this short notice is not the worst feature as it refers to the proceedings for the dominio only. The fatal defect, as we see it, in the order itself is in that it did not give those who might be the real owners of property, as against mere posesorio titles that had already existed for six years, any time at all to bring ejectment or deshaucio proceedings, as plaintiffs, in the local courts to assert their rights. The municipal courts, where dominio proceedings could then be carried on, had jurisdiction only up to $400, and as this land was worth much more, these children, even if they knew of the dominio proceedings, could not in the fifteen days' notice given in the official gazette, come to San Juan, employ counsel, and file such a suit.

We are informed that happily but few dominio titles were obtained under the military order in question, but even if there had been many, it would be no reason why these complainants should be deprived of their property, save by due process of law. It may possibly be the case, and no doubt is, that at the time of the issuance of the order referred to, on April 4, 1899, there were many persons improperly, or even fraudulently holding posesorio certificates to land, in favor of whom the statute. had yet from a few months to perhaps several years to run, and we can well see how it could be argued that the real owners had, notwithstanding the order. a reasonable time in which to assert their rights, and therefore, as the question is not before

us, we are expressing no opinion as to what the position of the real owners of such property would be in now attacking a dominio title in the hands of innocent third parties.

We therefore hold that the military order referred to, of April 4, 1899, in so far as these complainants are concerned, was, and is as to them null and void, and that they having proved their right to, and ownership of the property in question, and the respondent firm having shown no title thereto, because we hold that they received no title by their so-called deed under the alleged dominio title of Morales, the court which issued the certificate of dominio having been wholly without jurisdiction, they should recover the land described in the complaint, and that they are entitled to have the alleged title now standing in the name of the respondent firm of J. Ochoa y Hermano, and the registry thereof, canceled as against them, and a proper decree in accordance with the bill and the views here expressed, and to put complainants into possession, will be prepared for the court's signature.

On the whole case, the proofs show that respondents have made no profit out of the possession of the land, and that it had little or no rental value, so, besides depriving them of the land, no damages will be allowed and only the costs of the suit will go with the decree. However, as this decision is a very important one, and as the rights of the parties turn on the application of the Constitution of the United States to the facts, all facilities for an appeal will be allowed if applied for.